```
J9glfiaa
```

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  ALEXANDRA FIALLOS, as parent
   and natural guardian of L.F.,
4  and ALEXANDRA FIALLOS,
   individually,
5
                  Plaintiff,
6
              v.                          19 Civ. 334 (JGK)
7
   NEW YORK CITY DEPARTMENT OF
8  EDUCATION,

9                  Defendant.             Oral Argument

10 ------------------------------x
                                          New York, N.Y.
11                                        September 16, 2019
                                          10:49 a.m.
12
   Before:
13
                    HON. JOHN G. KOELTL,
14
                                          District Judge
15
                        APPEARANCES
16
   BRAIN INJURY RIGHTS GROUP
17      Attorneys for Plaintiff
   BY:  KARL J. ASHANTI, ESQ.
18
   NEW YORK CITY LAW DEPARTMENT
19 OFFICE OF THE CORPORATION COUNSEL
        For Defendant
20 BY:  ANDREW J. RAUCHBERG, ACC
        COPATRICK THOMAS, ACC
21

22

23

24

25

```

J9g1fiaa

1        (Case called)

2        THE DEPUTY CLERK:  All parties please state who they

3   are for the record.

4        MR. ASHANTI:  For the plaintiff, Karl Ashanti from the

5   Brain Injury Rights Group.  Good morning, your Honor.

6        THE COURT:  Good morning.

7        MR. THOMAS:  Good, morning, your Honor.  Patrick

8   Thomas from the New York City Law Department on behalf of the

9   Department of Education.

10        MR. RAUCHBERG:  And good morning, Judge.  Andrew

11   Rauchberg also from the law department, and also on behalf of

12   the Department of Education.

13        THE COURT:  Okay.  Good morning.

14        There are cross-motions for summary judgment, so

15   plaintiff logically goes first, unless you've all agreed to

16   something else.  So, Mr. Ashanti?

17        MR. ASHANTI:  Yes, your Honor.

18        So as your Honor knows, this concerns an IDEA action

19   brought by the parents of this minor plaintiff who receives

20   special education, and specifically, it concerns the provision

21   within the IDEA that provides for interim relief for such

22   families while the adjudication of their underlying due process

23   complaint with the IHO's office is being determined, during the

24   pendency of that proceeding; hence the name pendency.  And the

25   "stay put" provision under which this action was filed, it

J9g1fiaa

    1   entitles this minor plaintiff and all minor children receiving

    2   special education with that interim funding for the period of

    3   time that the underlying due process complaint is being

    4   adjudicated.  And that is what was found specifically by the

    5   IHO here, Helene Peyser, through her pendency order issued on

    6   October 15th of 2018.  Subsequent to that, the DOE failed and

    7   refused to implement that order, essentially granting itself a

    8   stay without ever moving before your Honor or any other --

    9           THE COURT:  But eventually --

   10           MR. ASHANTI:  -- court or jurisdiction.

   11           THE COURT:  But eventually gave all of the relief.

   12           MR. ASHANTI:  Well, your Honor, it's important to

   13   note -- that is correct.  There was funding eventually.  But

   14   it's important to note that the DOE had appealed the original

   15   pendency order, and that decision, at the SRO level, came down

   16   on December 21st of 2018 and it was favorable to the parents,

   17   meaning that the SRO determined that substantial similarity was

   18   the correct test to be applied, that they had satisfied that

   19   test, and that therefore the pendency placement, educational

   20   program that should be implemented for the student was at

   21   iBrain, where she was being educated at the time.

   22           Even with that decision, the Department of Education

   23   did not immediately implement the pendency funding for the

   24   student, and subsequent to that, there was this action brought

   25   before your Honor; and eventually, on March 25th of this year,

J9g1fiaa

1    there was a decision on the underlying case that again was

2    favorable to the plaintiff.

3              THE COURT:  And gave all the relief.

4              MR. ASHANTI:  That gave all of the relief.  And, more

5    importantly, determined in favor of the plaintiff the issue of

6    whether or not iBrain was an appropriate placement for the

7    student, you know, under the *Burlington-Carter* test.

8              So at every level, in every way, the plaintiffs were

9    victorious.  However, the relief that they had sought initially

10   that should have been originally granted to them was denied by

11   the department.

12             THE COURT:  And you seek summary judgment on your

13   claim for a declaratory judgment.

14             MR. ASHANTI:  Well, it's actually essentially more

15   than that, your Honor, because --

16             THE COURT:  I read your papers as a motion for summary

17   judgment on your claim for declaratory judgment.

18             MR. ASHANTI:  Yes, your Honor, but my point in saying

19   that it's more than that is the idea that there are these

20   statutorily, federally statutorily guaranteed rights of this

21   student that were denied by the DOE.

22             THE COURT:  Yes, but you asked for a declaratory

23   judgment that the rights were wrongfully denied.

24             MR. ASHANTI:  Correct, your Honor.  And that is also

25   to, number one, make sure that the rights of this minor

J9g1fiaa

1    plaintiff and the family were vindicated and that there is no

2    repeat of this violation of the federal statute, because that

3    is, you know -- as your Honor knows, this action concerns the

4    '18-'19 school year, and so every school year there is this

5    determination, adjudication, you know, potentially between the

6    parents and the school district, and without any determination

7    that the rights of the student were violated with respect to

8    the pendency provision, there's absolutely nothing to stop the

9    department from repeating this kind of action year after year,

10   which, with each passing school year, you know, could basically

11   ignore the rights of this student and just do what it wants to

12   do even though, on the merits of every adjudication that has

13   taken place, it was favorable to the plaintiffs.  And so simply

14   we are seeking determination that the student's rights were

15   violated as a means of vindicating those rights and preventing

16   this from happening in the future.

17           THE COURT:  This is simply a factual question that

18   this motion doesn't turn on at all, but there had been a whole

19   series of cases of parents whose children were enrolled at

20   iHope and there was a determination by an IHO that iHope was a

21   proper placement for the child and then parents unilaterally

22   take the child from iHope and enroll them in iBrain.  There has

23   now been a whole series of decisions where IHOs and SROs have

24   found that iBrain offers equivalent services to iHope.  Could

25   you just give me some insight into what it is that's causing

J9g1fiaa

1    this.

2            MR. ASHANTI:  Causing -- the "this," what --

3            THE COURT:  The "this" is a whole series of parents

4    withdrawing children from iHope and putting them in iBrain

5    under circumstances which would at least risk funding, because

6    iHope had been determined to be a satisfactory placement for

7    the child but the parents are still withdrawing children from

8    iHope and placing them in iBrain.  Is iHope closing down or --

9            MR. ASHANTI:  No, your Honor.  Quite simply, in

10   response to your Honor's inquiry, I mean, there's a very good

11   reason for that.  I mean, the parents, number one, they knew

12   that the new iteration, the new school, iBrain, the educational

13   programs that would be provided to their child in each

14   individual case was substantially similar, virtually identical,

15   and in some cases identical to the educational program that the

16   child previously received in the prior school year.  So while

17   there was this unilateral move, we first take exception to the

18   kind of idea of a withdrawal, because none of the students were

19   withdrawn.  So all of the students completed the '17-'18 school

20   year at iHope and just, you know -- which each school year is

21   separate.  They decided to enroll the student in a new

22   school --

23           THE COURT:  Why?

24           MR. ASHANTI:  -- for '18-'19 -- because the

25   administration of iHope had changed dramatically.  There was a

J9g1fiaa

split between the original founders and some of the board, and

so the original founders and many of the teachers and staff

left to create iBrain.  And the purpose --

THE COURT:  I see.

MR. ASHANTI:  The purpose was to create a new school

that was essentially a replica of the original iHope.  So while

the name of iHope has been maintained and the school is not

closed, it's still open, it's just drastically different.

So originally the population of students was solely

those who suffered from traumatic brain injuries.  And then

during the course of the '17-'18 school year, that changed and

there was another organization --

THE COURT:  It changed at iHope.

MR. ASHANTI:  At iHope.  There was another

organization that took over called YAI and instituted a number

of wholesale changes, including changing the population of the

students to add students of varying disabilities, which is

fine, but it's not what iHope was originally intended to be,

and so therefore, with opening up iBrain, the idea was, this is

going to be a replica of the original iteration of iHope.  And

that's exactly what's happened.  I mean, with all the

students -- the students have changed, the staff had moved

over, the original founders had moved over, it was the same

philosophy as the original philosophy, and so iBrain today is

more of a representation of the original iHope than iHope is

J9g1fiaa

1    today.

2              THE COURT:  That provides the explanation precisely

3    that I was looking for, so thank you.

4              Where physically are iHope and iBrain located?

5              MR. ASHANTI:  Well, iHope is I believe 126th Street in

6    Manhattan, and iBrain is 95th Street and Second Avenue.

7              THE COURT:  Not very far away from each other.

8              MR. ASHANTI:  Not very far away.

9              THE COURT:  Okay.

10             MR. ASHANTI:  So it wasn't the distance; it was the

11   philosophy, the actual educational program being offered to the

12   students.

13             And here, we're just simply saying, the concern of --

14   well, the DOE, one of the main concerns they raised with your

15   Honor was, well, the parents could lose the underlying due

16   process proceeding and not have to pay back the money, pay back

17   that money.  But the fact that the FOFD was won by the parents,

18   besides the point of the "stay put" provision in general, was

19   unfounded.  It was always unfounded.  And the DOE just sought

20   to, you know, avoid upholding its obligations, and

21   unfortunately thus far it has been able to do so, and we're

22   just simply hoping to vindicate the rights of the student.

23             THE COURT:  Your cases are still pending in the Court

24   of Appeals, aren't they?

25             MR. ASHANTI:  There are a few cases that are pending

J9g1fiaa

1    in the Court of Appeals.  They are very different than this

2    case, though, your Honor, because of the very fact that -- I

3    mean, in a couple of those cases that are going to the Second

4    Circuit, there were unfavorable original determinations of the

5    parents that were sought on appeal in this court, unlike this

6    case, where all along there was this favorable determination

7    that the DOE refused to implement, there was an appeal to the

8    SRO level, the parents won there, and still at that time there

9    was no implementation, and so we're simply seeking to hold them

10   accountable.

11            THE COURT:  Refresh my recollection on what the school

12   year was that iBrain initially opened.

13            MR. ASHANTI:  '18-'19.

14            THE COURT:  But this situation is unlikely to recur.

15   I mean, these are the people who were initially at iHope and

16   then moved to iBrain for the '18-'19 year.  There's no reason

17   to expect that these people, having obtained a pendency

18   placement in iBrain, are now going to move somewhere else.

19            MR. ASHANTI:  That is correct, your Honor.  But see,

20   here's the irony of it all.  The DOE's position has been, in

21   this and other cases, well, you know, you can't just let

22   parents move their children from place to place to place, when

23   that did not comport with the facts at all.  It was a one-time

24   decision made under very unique circumstances, and so it was

25   the parents' position that the law is the law, so whether or

J9g1fiaa

1   not, you know -- it's not like there are many schools dedicated

2   to educating, you know, children with traumatic brain injuries.

3   There are not.

4           But even besides that, the point is, there was a test,

5   a legal standard that had to be upheld in any instance where

6   there was any kind of change.  You actually had to show that

7   the substantive educational program a student would receive at

8   the new location is substantially similar to the one that they

9   previously received, and that's what we've shown here.  And so

10  the idea of, well, it's not likely to recur, well, it could

11  recur, not just in the pendency, but with respect to any IHO

12  decision that is issued with respect to an FOFD that's issued.

13  It's basically DOE saying, we set our own rules; the law, you

14  can leave that aside; we get to decide if and when we're going

15  to implement any order that's favorable to the parents.  And

16  that's just not what the law provides.

17          THE COURT:  Thank you.  You know, actually, your

18  explanation of the institution of iBrain is very instructive,

19  so thank you.

20          MR. ASHANTI:  Thank you.

21          THE COURT:  Defendants?

22          MR. THOMAS:  Just briefly, your Honor.  I can pick up

23  where plaintiff's counsel left off.

24          So we agree with plaintiff's counsel that this case is

25  unlikely to be repeated.  It seems unlikely, particularly given

J9g1fiaa

1    the effort that plaintiffs have made --

2              THE COURT:  Can you keep your voice up, please.

3              MR. THOMAS:  Given the efforts that plaintiff have

4    made to secure placement at iBrain, it seems unlikely that they

5    would then, in the future or the near future, remove the

6    student from iBrain, which would need to occur in order for

7    this case to be repeated.

8              The other thing that plaintiff's counsel raised that

9    is relevant to this case, the Department of Education has

10   agreed to fund the student's placement for the 2019-2020 school

11   year.

12             THE COURT:  Can you go a little slower and keep your

13   voice up.

14             MR. THOMAS:  Sure.  The Department of Education has

15   agreed to fund the student's placement for the 2019-2020 school

16   year, and that just further supports the argument that this

17   claim is unlikely to be repeated.

18             But the Court need not even address the merits of this

19   case.  As we've stated in our opposition papers and our motion

20   papers, plaintiffs are not entitled to the relief that they

21   seek because what they seek is backwards-facing declaratory

22   relief, and the Second Circuit has said that that sort of

23   relief is not available.  Both the notice of motion and the

24   complaint itself seek in particular --

25             THE COURT:  Keep your voice up.

J9g1fiaa

1      MR. THOMAS:  Both the notice of motion and the

2   complaint itself seek in particular declaratory relief

3   indicating that the Department of Education has violated in the

4   past the student's or the plaintiff's rights.  But that sort of

5   relief, for the reasons we stated in our papers, is not

6   available.  Plaintiff make no response to that either here or

7   in their motion papers.

8      THE COURT:  Okay.  Thank you.  I'm prepared to decide.

9

10      The plaintiff, Alexandra Fiallos, brings this action

11   against the defendant, the New York City Department of

12   Education ("DOE") alleging that the defendant violated her

13   daughter's rights to pendency under the Individuals with

14   Disabilities Act ("IDEA") Section 20 U.S.C. § 1415(j), and that

15   the failure to implement a pendency order deprived the

16   plaintiff's daughter of her rights, in violation of 42 U.S.C.

17   § 1983.  The plaintiff also alleges violations of her

18   daughter's rights under New York Education Law §§ 4404 and

19   4410.

20      In a previous order, the Court dismissed the

21   plaintiff's request for a preliminary injunction seeking

22   reimbursement of past expenditures.

23      Before the Court now are the parties' cross-motions

24   for summary judgment.  The plaintiff moves for summary judgment

25   granting her request for a declaratory judgment that the

J9g1fiaa

defendant's refusal to implement an order of pendency was

beyond the bounds of its authority and a violation of 20 U.S.C.

§ 1415(j).  The defendant moves for summary judgment denying

the plaintiff's request for a declaratory judgment and

dismissing the case because the only claim remaining in the

case is the claim for a declaratory judgment.

          The standard for granting summary judgment is well

established.  "The Court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a); see also *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322-23 (1986); *Gallo v. Prudential*

*Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.

1994).  "[T]he trial court's task at the summary judgment

motion stage of the litigation is carefully limited to

discerning whether there are any genuine issues of material

fact to be tried, not to deciding them.  Its duty, in short, is

confined at this point to issue-finding; it does not extend to

issue-resolution.  *Gallo*, 22 F.3d at 1224.

          The substantive law governing the case will identify

those facts that are material and "[o]nly disputes over facts

that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

          Where there are cross-motions for summary judgment,

J9g1fiaa

the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law.  *See Admiral Indem. Co. v. Travelers Cas. & Sur. Co. of Am.*, 881 F. Supp. 2d 570, 574 (S.D.N.Y. 2012).  The standards that apply to motions for summary judgment are well established.  See generally *Scotto v. Almenas*, 143 F.3d 105, 114–15 (2d Cir. 1998).

The following facts are undisputed unless otherwise noted.  The plaintiff's child has a brain injury and was classified as a student with a disability under the IDEA for the 2017–2018 and 2018–2019 school years.  Def.'s 56.1 Stmt. ¶ 1.  Under the IDEA, the defendant is obligated to provide students who have a disability with a free and appropriate education ("FAPE") every school year.  The defendant contends that such obligation is required only for years in which the student is classified as a child with a disability and resides in the New York City School District.  Def.'s Response 56.1 Stmt. ¶ 3.  When the defendant allegedly failed to provide the child with a FAPE for the 2017–2018 school year, the plaintiff commenced a due process proceeding that resulted in an unappealed decision of an impartial hearing officer ("IHO") in February 2018, allowing the child to be placed in the International Academy of Hope ("iHope").  Pl.'s 56.1 Stmt., ¶¶ 4–6.  In June 2018, the plaintiff unilaterally removed her child from iHope and enrolled her child at the International

J9g1fiaa

Institute for the Brain ("iBrain") for the 2018–2019 school
year.  *Id.* ¶¶ 7, 9.  The child began attending iBrain on or
about July 9, 2018, and on the same day, the plaintiff brought
a second due process complaint against the defendant,
requesting that the DOE fund the child's placement at iBrain.
Def.'s 56.1 Stmt. ¶¶ 3, 4.

On October 15, 2018, an IHO issued a pendency order,
finding that iBrain's programming was substantially similar to
the programming at the child's previously approved placement at
iHope.  Def.'s 56.1 Stmt., ¶ 5; Ashanti Decl. Ex. D, at 4–5.
The order directed the DOE to fund the child's placement at
iBrain beginning July 9, 2018, through the pendency of the due
process proceeding.  *Id.*  The defendant filed an administrative
appeal of that order to the Office of State Review ("SRO") on
or about November 26, 2018.  Def.'s 56.1 Stmt. ¶ 6.  In a
December 21, 2018 order, the SRO reversed the IHO's order in
part, holding that iBrain did constitute the pendency placement
of the plaintiff's child, but only as of October 12, 2018.  *Id.*
¶ 7; Ashanti Decl., Ex. F, at 17.  Pursuant to the SRO
decision, the defendant began funding the child's placement at
iBrain from October 12, 2018.  Def.'s 56.1 Stmt. ¶ 7.

On March 25, 2019, an IHO issued a Findings of Fact &
Decision ("FOFD") on the underlying due process proceeding
initiated by the plaintiff on July 9, 2018.  In that decision,
the IHO found that the child was entitled to tuition payments

J9g1fiaa

at iBrain for the entire 2018-2019 year.  Def.'s 56.1 Stmt.

¶ 9; Ashanti Decl. Ex. G, at 11.  The defendant has now fully

funded the child's placement at iBrain for the 2018-2019 school

year.  Def.'s 56.1 Stmt. ¶ 10; Thomas Decl. ¶¶ 3-4.

        The plaintiff seeks a declaratory judgment declaring

that the defendant's refusal to implement the IHO order dated

October 15, 2018, was beyond the bounds of its authority and a

violation of the child's rights under 20 U.S.C. § 1415(j).

        "To obtain <u>prospective</u> relief, such as a declaratory

judgment or an injunction, a plaintiff ... must demonstrate a

certainly impending future injury.  In establishing a certainly

impending future injury, a plaintiff cannot rely solely on past

injuries; rather, the plaintiff must establish how he or she

will be injured prospectively and that the injury would be

prevented by the equitable relief sought." *Marcavage v. City

of N.Y.*, 689 F.3d 98, 103 (2d Cir. 2012).  A plaintiff may not

seek declaratory relief aimed at past conduct. *See H.B. v.

Byram Hills Cent. Sch. Dist.*, 648 F. App'x 122, 125 (2d Cir.

2016) (noting that past conduct is an "impermissible target" of

declaratory relief).

        For the injury in this case to recur, the plaintiff

would have to unilaterally remove her child from iBrain,

transfer her child to a new placement without a showing that

the new placement was substantially similar, and pursue another

due process proceeding seeking funding for the new placement.

J9g1fiaa

There is no indication in the record that the plaintiff plans
to take these steps.  Even if she were to do so, the plaintiff
would then have to receive a favorable IHO order directing the
defendant to provide funding for the new placement and the
defendant would have to decline to implement the order while
contemplating an appeal.  These steps are too remote to show a
certainly impending future injury.  On the contrary, the record
shows that the child may stay at iBrain; the defendant has
implemented the IHO's FOFD issued on March 25, 2019, and has
fully funded the child's placement at iBrain for the 2018-2019
year, including the tuition from July through October 2018.

          Indeed, the background information provided by the
plaintiff at the argument emphasizes the remote nature of any
possibility that the situation in this case may recur.  The
transfer from iHope to iBrain for the 2018-2019 school year was
an unusual circumstance created by changes at iHope, which led
parents, such as the parent in this case, to transfer children
from iHope to iBrain for the 2018-2019 school year.  There is
no indication that those situations are likely to recur.

          Plainly, the Court appreciates the background
information and is not relying on that information for its
decision solely on the papers before it.  There is no showing
that the situation at issue in this case is likely to recur,
and in any event, the declaratory judgment is directed at past
conduct, not future conduct.

J9g1fiaa

1          The plaintiff contends in her reply brief that her

2     claim is not moot because her alleged injury, caused by the

3     defendant's noncompliance with an IHO order of pendency subject

4     to appeal, can occur every school year and is thus capable of

5     repetition, yet evading review.  However, the defendant does

6     not argue that the plaintiff's case is moot; instead, the

7     plaintiff correctly argues that declaratory relief, which is

8     the only relief sought by the plaintiff, is unavailable.

9          The defendant also argues that it does not have an

10    obligation to enforce an IHO order subject to appeal.  It is

11    unnecessary to reach that issue to award summary judgment in

12    this case.

13         Therefore, for the foregoing reasons, the defendant's

14    motion for summary judgment is granted and the plaintiff's

15    motion for summary judgment is denied.

16         The clerk is therefore directed to enter judgment

17    dismissing this case.  The clerk is also directed to close all

18    pending motions and to close this case.

19         So ordered.

20         Thank you, all.

21         MR. ASHANTI:  Your Honor, if I may, just one issue, I

22    think.

23         THE COURT:  Sure.  Go ahead.

24         MR. ASHANTI:  And it's a very peculiar result here,

25    because as your Honor knows, that in this kind of action, the

J9g1fiaa

plaintiffs, as prevailing parties, would be entitled to

attorney's fees that are required and relevant to the

litigation, and at every level here, the plaintiffs have

prevailed on the merits.  The plaintiff prevailed with respect

to the adjudication of the IHO at the administrative level; the

parents prevailed with respect to the appeal to the SRO; and

certainly I believe, you know, the record shows, and the case

law that the plaintiffs have relied upon here, shows that the

DOE was never entitled to withhold implementation of the

pendency order while it appealed.  So I appreciate the fact

that defendants raised that and your Honor said that it's not

necessary to decide that issue, but all of the issues that have

been brought before your Honor and at the administrative level

have been resolved in the plaintiff's favor, and I believe that

that entitles the plaintiffs to relief.

        THE COURT:  I never decide issues until they're

briefed on the facts and the law, so nothing that I say at the

moment is a finding, but let me give you some observations.

        First, with respect to the issue of attorney's fees,

the rules provide for the application of attorney's fees after

judgment.  So plaintiff makes a motion, defendant responds,

plaintiff replies, and if you needed more time, I would extend

the time.  But under Rule 54(d)(2)(B)(i), unless a statute or a

court order provides otherwise, the motion, which is the motion

for attorney's fees, must be filed no later than 14 days after

J9g1fiaa

 1   the entry of the judgment.  So I would enter a judgment, and

 2   then you would have the opportunity to file for attorney's

 3   fees.  Again, I don't decide anything until it's briefed on the

 4   facts and the law.  You all know these better than I do.  There

 5   are provisions, aren't there, for attorney's fees for the

 6   administrative proceedings, including going up to the SRO,

 7   right?

 8             MR. ASHANTI:  Yes, your Honor.

 9             THE COURT:  Where are those applications made?  Are

10   they made here in a decision before me or are they made before

11   the DOE and, if you're not satisfied with the result before the

12   DOE, then a proceeding is brought before me?

13             MR. ASHANTI:  Well, I believe it remains at the

14   administrative level based upon the fact that that adjudication

15   was purely at the administrative level.  So I'd be talking

16   about now the FOFD, which was decided purely at the

17   administrative level.  There was the IHO decision, and DOE, you

18   know, chose not to appeal, so now it's an unappealed

19   determination in favor of the plaintiff at that level.  But

20   that concerns the FOFD itself and not the litigation regarding

21   the pendency.

22             THE COURT:  No.  I was drawing a distinction between

23   the administrative proceedings and the proceedings before me.

24   So with respect to the administrative proceedings, again, I

25   don't decide anything until it's briefed, but you succeeded in

J9g1fiaa

1    the administrative proceedings, right?

2              MR. ASHANTI:  Yes, your Honor.

3              THE COURT:  Prevailing party in the administrative

4    proceedings.  And you presumably are entitled to attorney's

5    fees for the administrative proceedings.

6              MR. ASHANTI:  Yes, your Honor.

7              THE COURT:  Where would you make that application and

8    when?

9              MR. ASHANTI:  Well, that would be before, at the IHO

10   level, to see if there's any agreements with the DOE, and if

11   not, if there was an unfavorable determination, then we would

12   bring -- the parents could bring an appeal to the Southern

13   District or another court of competent jurisdiction.

14             THE COURT:  Okay.  So you began by explaining that the

15   parents won at the various administrative proceedings and

16   therefore the parent should be entitled to attorney's fees for

17   prevailing in the administrative proceedings.  Okay.  Again, I

18   don't decide it, but you tell me that there are procedures for

19   the parents to get attorney's fees for their successful

20   prosecution of the administrative proceedings.  Okay.  Then

21   there is the question of what happens to the proceeding before

22   me.  And you're welcome to, again, file an application, brief

23   it.  And not so clear to me that the parents succeeded before

24   me or should be entitled to attorney's fees for pursuing the

25   case before me when they were succeeding in the administrative

J9g1fiaa

1    proceedings and they were looking for relief before me, to

2    which I found they were not entitled in the preliminary

3    injunction and ultimately not entitled in the lawsuit.  So you

4    say, but they've won all along the way.  They won all along the

5    way in the administrative proceedings but not in the court

6    proceedings.  So I wanted to make sure that they had an avenue

7    in the administrative proceeding to get attorney's fees for

8    their successful prosecution of the administrative proceeding.

9              MR. ASHANTI:  Yes, your Honor.

10             THE COURT:  And you're welcome to brief it before me

11   as to whether you're also entitled to attorney's fees for the

12   lawsuit before me.

13             MR. ASHANTI:  I think, your Honor, we may take your

14   Honor up on that, for the very simple reason that the heart of

15   the case all along, of the litigation, was the essential

16   question, does the DOE have the right to withhold

17   implementation of a pendency order when it's favorable to the

18   plaintiff, and I think that the DOE has not prevailed on that

19   point here, and I don't think that they could, based upon the

20   case law.

21             THE COURT:  But again, neither have you.

22             MR. ASHANTI:  Based upon your Honor's ruling, I would

23   say that's true, but your Honor obviously explicitly withheld

24   deciding that issue as to whether or not they were entitled --

25             THE COURT:  Why ever should I decide it?  The

J9g1fiaa

plaintiff is not entitled to relief before me so we ought not

to be issuing advisory opinions, and if the plaintiff had

paused before engaging in all of the litigation before me and

said, are we really entitled to relief before the Court, should

we be bringing this litigation before the Court, should we be

using the court's resources and the plaintiff's resources and

the defendant's resources?

So again, I don't want to decide anything until it's

briefed, but I would certainly pause.

I do note that at the beginning of the litigation, the

DOE had not paid for some months of the pendency placement but

eventually did, and so there would be an issue whether that was

caused by the litigation, that they eventually did, or whether

it was just caused by the fact that eventually the

administrative proceedings said pay, and when the

administrative proceedings finally said pay, they paid.  So --

MR. ASHANTI:  But in terms of the timing, your Honor,

the whole idea of the litigation was the pendency is an interim

right and so -- and it comes with an automatic preliminary

injunction, and I understand your Honor did not issue a

preliminary injunction here, but the idea is that you're

entitled to immediate enforcement of this fleeting right, this

pendency provision right, which is why the litigation was

instituted in the first place.  And I do think that your Honor

is on to something when the fact that when this was raised and

J9g1fiaa

1  it became less of a bureaucratic issue of the DOE just deciding

2  what to do on its own, having been brought to the Court, you

3  know, there's never been a determination or any case law cited

4  by the DOE in support of its position that it has a right to

5  essentially give itself a stay without moving for a stay,

6  whereas the plaintiffs provided plenty of case law across the

7  country that the automatic stay is a one-way street so that --

8       THE COURT:  Oh, I think that overstates the law.  I

9  thought when I reviewed the cases that -- in fact, in coming to

10  my decision on the preliminary injunction, there were cases on

11  the merits that supported the city's position and that I

12  thought that you were overstating the state of the case law,

13  although my recollection is that the cases could be read as

14  somewhat of a split and that there was at least one of my

15  colleagues who agreed with your argument, but that there was at

16  least another colleague who disagreed.  But it's not necessary

17  to rehash all of that at this point.

18       MR. ASHANTI:  Understood, your Honor.

19       Well, thank you for your Honor's decision, and we will

20  consider whether or not to make such a motion before your

21  Honor.  Thank you.

22       THE COURT:  Does the city want to be heard on that

23  issue, the issue of attorney's fees?

24       MR. THOMAS:  As your Honor knows, we haven't had an

25  opportunity to brief this issue.  I will just note what the

J9g1fiaa

1    Court already has, which is that in this proceeding, plaintiffs

2    lost both on their PI application, they've also lost on their

3    motion for summary judgment, and the Court has already today

4    ordered that judgment be entered for DOE.  Under those

5    circumstances --

6            THE COURT:  Okay.  Plainly what the parties should do

7    is to sit down and talk about this issue.  The plaintiff says

8    the plaintiff has won in the administrative proceedings and is

9    entitled to attorney's fees in the administrative proceedings.

10   Whether the plaintiff is entitled to attorney's fees in the

11   case before me would raise other questions.  Among those

12   questions would certainly be whether the litigation was any

13   catalyst for any payment of the pendency proceedings, the award

14   and any portion of the award in the pendency proceeding, and I

15   would have thought that the parties would be able to resolve

16   the issue of attorney's fees without yet another set of motions

17   before me.

18           MR. ASHANTI:  We will endeavor to do that, your Honor.

19           THE COURT:  Okay.  Thank you, all.  Good to see you,

20   all.

21           ALL COUNSEL:  Thank you.

22                            o0o

23

24

25